## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Criminal No. 21-cr-0067 (ABJ)** |
| **MARK SIMON,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Mark Simon to 45 days of incarceration and $500 in restitution.

### I.   Introduction

Simon participated in the January 6, 2021, attack on the United States Capitol -- a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured over 100 law-enforcement officers, and resulted in over $1.4 million worth of property damage.

Simon stands before this Court to be sentenced on a misdemeanor conviction, but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

Here, the defendant's participation in a riot that succeeded in delaying the Congressional certification renders a custodial sentence both necessary and appropriate in light of his extensive

criminal history.  According to the PSR, Mark Simon has ten prior convictions demonstrating a lack of respect for the law.  See PSR at paragraphs 33-42. On January 6, 2021, when presented with the reality of what other rioters were doing and while under court supervision in California, Simon enthusiastically joined the mob and forced his way into the Capitol.  Simon unlawfully entered the Capitol at the Rotunda Doors, the site of one of the most brutal breaches of the Capitol on January 6, 2021. Multiple assaults of U.S. Capitol Police ("USCP") officers occurred there, some of which Simon captured on his cellphone. Once inside the Capitol, Simon recorded boastful statements on the cellphone about being in the Capitol.  In addition, following the events of January 6, Simon's video was posted on social media.

## II.    <u>Factual and Procedural Background</u>

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. See ECF 24 (Statement of Offense) at 2-3.    As this court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.

*Mark Simon's Role in the January 6, 2021 Attack on the Capitol*

On January 3rd, the Defendant and his girlfriend [1],  flew from California to Washington, D.C.  On January 6th, they attended the "Stop the Steal" rally on the Ellipse.  When the speeches were over, the Defendant and his girlfriend walked to a hotel and eventually walked toward the Capitol building.  After arriving on the east side of the Capitol, the Defendant joined with other members of a mob -- the Defendant, took video as he approached the doors leading into the Capitol. As he panned from the U.S.  Capitol doorway to the crowd, the U.S. Supreme Court and the Library of Congress could be viewed in the background.  A beeping sound that appeared to be an alarm

---

[1] The defendant's girlfriend was not charged because she did not enter the Capitol due to the gas fumes.

could be heard from inside the U.S. Capitol throughout the video.



*Simon outside the U.S. Capitol*



*Simon entering the U.S. Capitol*



*Simon capturing officers in the crowd
in front of him*



*Simon  moving closer to the officers attempting to
remove individuals from inside the U.S. Capitol*



*Simon capturing the crowd of officers directly in front of him*

The video showed numerous individuals pushing their way into the U.S. Capitol, while others exited the U.S. Capitol.  As he approached the doorway to the U.S. Capitol law enforcement officers inside the U.S. Capitol could be seen on the video taken by Simon using his phone held above his head.  In the video the law enforcement officers are attempting to remove individuals from the building as seen in the screenshots above. Broken glass windows could be observed on two of the doors of the U.S. Capitol, including one that was directly next to Simon while he was taking the video.  Once Simon was in the threshold of the U.S. Capitol building, he turned the camera on himself and said, "In the Capitol baby, yeah!"  Shortly thereafter, Mark Simon turned the camera on himself again and said, "2021 Donald Trump!"

A screen shot of Simon entering past the broken glass on the Rotunda doors is below.



Mark Simon has admitted that he knew he did not have permission to enter the Capitol and that he paraded, demonstrated, and/or picketed within the building. There was violence and chaos all around him and yet he continued to enter the Capitol.

*Social Media Posts*

On January 13, 2021, the video of Simon was viewed by an FBI agent in a blog. The post included images of Simon "From HB to DC: [Individual 1[2]] and tanned BF help Storm the Capitol for Trump!" The HB is an obvious reference to Huntington Beach and the BF is a reference to boyfriend or best friend. The post included images and video of a female and Simon, who the blog claimed were at the U.S. Capitol on January 6, 2021. According to the

_____

[2] Individual 1 is the uncharged girlfriend that traveled to DC with Mark Simon and posted the images on her Facebook page with the caption "Peacefully Storming the Capitol…#StopThe Steal."

post, the images and video had previously been posted on the Facebook page for Individual 1 but had since been deleted.  Investigators were later able to locate the video and confirm it was posted to Individual 1's Facebook page with the caption, "Peacefully Storming the Capitol…#StopTheSteal."



*The Charges and Plea Agreement*

On January 21, 2021, Simon was charged by complaint with violating Title 18, United States Code, Section 1752(a)(1) and (2) and Title 40, United States Code, Section 5104 (e )(2)(D) and (G).  On January 28, 2021, Simon was arrested pursuant to the criminal complaint.

On February 2 2021, a four-count Information was filed charging the Defendant with Entering and Remaining in a Restricted Building, in violation of Title 18, United States Code,

Section 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building, in violation of Title 18, United States Code, Section 1752(a)(2); Violent Entry and Disorderly Conduct in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G).

On August 19, 2021, Simon entered a guilty plea to Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G). In his plea agreement, Simon agreed to pay $500 in restitution to the Department of Treasury.

### III.     Statutory Penalties

Simon now faces sentencing on a single count of Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six (6) months of imprisonment, and a fine of up to $5,000, pursuant to 18 U.S.C. § 3571(b)(6). [3]Simon must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. §3663(a)(3); *United States v. Anderson,* 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559(a)(7); U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. §3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id;* the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford

---

[3] Because the defendant has pled guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

adequate deterrence, § 33553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would -- at a minimum -- have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.

While looking at a defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors including: (1) whether, when and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9)

whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive or dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he  would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Even before he made it to the Rotunda Doors and entered the building, Simon knew a mob had descended on the Capitol.  He enthusiastically joined the mob pushing his way in through the crowd while taking video.  Simon's girlfriend remained outside due to the smell of the chemical irritants in the air.  While the Defendant did not personally engage in physical violence against law enforcement or destroy any government property, his breach of the Capitol was a serious violation of the law, and he must be held accountable.  In the video taken by Simon, an alarm can be heard in the background.  Mobs of people are in the doorway, and one person can be heard saying "they're spraying."  It appears the Capitol police are preventing the Mob from penetrating further into the Capitol building, and at second :55 in the video it appears there may be an altercation inside.  At minute 1:06 of the video it appears a Capitol Police officer is being helped off the ground.  It is unclear if Simon was able to see this as it appears he was holding the camera up above his head.  Just as Simon enters the doorway, he turns the camera to himself for a selfie where he holds up two fingers and states "In the Capitol baby, yeah!" and then "2021 Donald Trump!"

**B.  The History and Characteristics of the Defendant**

As set forth in the PSR, Simon is a 50-year-old man with a lengthy criminal history that includes convictions for assault with a deadly weapon as recently as February 19, 2020; carrying

a loaded unregistered firearm on February 19, 2019, vandalism on September 26, 2019, possession of a controlled substance on June 28, 2019, possession of marijuana for sale on February 7, 1992; transportation of Marijuana on March 26, 1998 and disorderly conduct February 4, 1992.[4] The defendant is no stranger to being placed on probation and is equally no stranger to probation violations and having his supervision revoked.  The defendant admittedly struggles with a long-standing narcotics addiction.  He admittedly supported his drug habit by selling "Donald Trump Hats." PSR  72.  The Government is not aware of Simon having an association with extremist groups or engaging in other criminal conduct on January 6.  Simon expressed an interest in entering a plea early in this case.  Shortly after a plea offer was extended, Simon accepted the plea and should receive credit for that early acceptance of responsibility, which the government has considered in making the sentencing recommendation.  Additionally, Simon recently expressed remorse for his conduct in an FBI interview on August 5, 2021, indicating that he was sorry this happened, some 7 months after he was charged and arrested.

C.  **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle,* 21-cr-00238(factor also weighs in favor of incarceration for a defendant like Simon, who likely

---

[4] Simon has five additional arrests for which include Burglary, Marijuana Possession for Sale, Driving without a License, Driving Suspended or Revoked, Driving with a Suspended or Revoked License. PSR at paragraphs 45-49.

witnessed the violent breach of the Rotunda Doors and boasted "In the Capitol, baby, yeah!" once he got inside.  TFH), Tr. 8/4/2021 at 3 (As Judge Hogan noted, "As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected.")

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. §3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637(D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.  As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-00188(RDM):

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr.7/19/2021 at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* At 70; *see United States v. Thomas Gallagher*, 1:21-cr-00041Tr. 10/13/2021 at 37 ("As other judges on this

11

court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demand deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-00188(RDM), Tr. At 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") And it is important to convey to future rioters and would-be mob participants- especially those who intend to improperly influence the democratic process- that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

There is also a strong need for specific deterrence here. Although the government has no evidence that Mark Simon participated in violent or destructive behavior, his presence at the Capitol -- along with that of all the rioters -- allowed January 6, 2021 to become the day it was. The defendant's decision to enter the Capitol, when his girlfriend declined to enter, despite the sights he witnessed, comes in a context of a long criminal history. A criminal history of the length and variety demonstrates a longstanding lack of respect for the law and the need for specific deterrence. Mark Simon has had many opportunities over the last 30 years to reflect on his involvement in the criminal justice system, yet he still chose to illegally enter the Capitol. Simon's behavior inside or while entering the Capitol shows he did not deem the consequences of his actions on January 6 to be that serious. Simon has been on probation in the past and has violated probation and does not seem amenable to supervision. In fact, he was under supervision at the time of this offense and is currently on probation. Further probation would be meaningless to

Simon.  Both the need to deter generally and to deter Simon specifically favor incarceration in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6]  Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not

---

[5]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, the government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating or picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, there are many differences among them that help explain the government's differing recommendations and sentences imposed by the courts, e.g., how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a

defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.  In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful

15

transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the specific blend of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in *United States v. David C. Mish, Jr*. 21-cr-112 (CJN) where defendant with extensive criminal history of 19 prior convictions was sentenced to 30 days incarceration, and *United States v. Michael Curzio*, 21-cr-41(CJN), where a defendant with a prior attempted first-degree murder conviction was sentenced to 6 months incarceration. Considering Simon's criminal history, the government's request avoids unwarranted sentencing disparities. Two other defendants whose criminal history served as a determining factor at sentencing are Robert Bauer and Edward Hemenway, who were charged as co-defendants in *United States v. Robert Bauer and Edward Hemenway*, 21-cr-49 (TSC). In that case, the government requested 30 days of incarceration and $500 in restitution. Both Bauer and Hemenway entered guilty pleas to the same count as Simon (one count of 40 U.S.C. § 5104(e)(2)(G)) after being charged by Information with the same four charges that were charged against Defendant Simon (18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G)). Judge Tanya S. Chutkan sentenced both Bauer and Hemenway to 45 days of incarceration, 60 hours of community service, and $500 in restitution.

16

To support its request for 30 days' incarceration of Bauer, the government pointed to the following factors: (1) although Bauer admonished other rioters not to assault law enforcement officers, he treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in a mob of people inside the Capitol with his middle finger raised; (2) Bauer remained inside the Capitol for a brief period of time – approximately 17 minutes – yet made his way into the Crypt, where police officers were being attacked; (3) Bauer admitted to his actions only two days after the riot and accepted responsibility early through a plea agreement; (4) Bauer has not expressed true remorse for his actions, stating to the FBI, "I don't feel like I done nothing terribly wrong"; and (5) Bauer has a serious criminal history. The government relied on many of the same factors regarding Hemenway, with the differences being that Hemenway did not admonish other rioters to not assault law enforcement, admitted to his actions a few days after the riot, and expressed remorse for his actions. 21-cr-49, ECF No. 33 at 2.

Bauer's criminal history involved Operating a Motor Vehicle Alcohol-Drugs in 1999, when he was 21 years old; Possession of Anhydrous Ammonia and Vandalism in 2005; Possession of Methamphetamine, Manufacturing Methamphetamine and related charges in 2005; and Unlawful Possession of Meth Precursor in 2006. Id. at 11-12.  Hemenway's criminal history dated back to 2004 and involved a conviction for Sexual Battery and Criminal Confinement in 2006. 21-cr-49, ECF No. 32 at 11.

Like Defendant Simon, neither Bauer nor Hemenway was personally involved in acts of violence or destruction, although all three were in the area where officers were assaulted by rioters. Bauer admonished other rioters not to assault law enforcement.  Bauer, Hemenway, and Defendant Simon all accepted responsibility early.  Defendant Simon has a longer criminal history than Bauer or Hemenway and was inside the Capitol for a shorter period of time than they were. The sentences

requested and imposed for Bauer and Hemenway show that the requested sentence for Mark Simon avoids unwarranted sentencing disparities.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.        <u>Conclusion</u>

Sentencing requires the Court to carefully balance the various factors set forth in 18

U.S.C. §3553(a).  As detailed above, the factors support a short sentence of incarceration.

Balancing these factors, the government recommends that this Court sentence Simon to 45 days

of incarceration and $500 in restitution.   Such a sentence protects the community, promotes

respect for the law, and deters future crime by imposing a modest term of incarceration as a

consequence of his behavior, while recognizing his early acceptance of responsibility.


                        Respectfully submitted,

                        Matthew M. Graves
                        UNITED STATES ATTORNEY
                        D.C. Bar Number 481052


By:    */s/ Brenda J. Johnson*
            Brenda J. Johnson
            Assistant United States Attorney
            D.C. Bar Number 370737
            555 4th Street, N.W., Room 11-450
            Washington, D.C. 20530
            Office: 202-252-7801
            Brenda.Johnson@usdoj.gov